KEEGAN, Administratrix, and another, Respondents, vs. CHICAGO, MILWAUKEE, ST. PAUL & PACIFIC RAILROAD COMPANY and others, Appellants.

*May 14—June 10, 1947.*

8

For the appellants there were briefs by *Bender, Trump & McIntyre,* attorneys, and *Rodger S. Trump* of counsel, all of Milwaukee, and oral argument by *Rodger S. Trump* and *Rodger M. Trump.*

For the respondents there was a brief by *Louis A. Koenig* of Monroe, and *Wilkie, Toebaas, Hart & Jackman* and *Thomas W. Pierce,* all of Madison, and oral argument by *Mr. Koenig* and *Mr. Oscar T. Toebaas.*

BARLOW, J.. The question presented is whether there is evidence to sustain the finding of the jury that appellant Rail-

road Company was guilty of causal negligence in failing to blow its whistle as the train approached the crossing where the collision occurred. The jury found appellant kept a proper lookout and the engine bell was ringing continuously from the time the engine was twenty rods from the crossing until it reached the crossing where the collision occurred.

Richard Keegan and Marshall DeRemer were employed by the L. C. L. Transit Company, whose business was hauling freight for hire. The Transit Company was a licensed carrier and picked up cheese and meat over a route including several cities and villages. February 21, 1945, at about 4:40 p. m., Marshall DeRemer was driving a 1939 model Ford truck on Thirteenth avenue in the city of Monroe, and Richard Keegan was riding with him, sitting in the front seat. It was daylight and the weather was clear. When the truck reached the railroad right of way it was traveling between ten and fifteen miles per hour. The truck was traveling south. There was a coal shed north of the railroad right of way and west of Thirteenth avenue, and a warehouse north of the railroad right of way and east of Thirteenth avenue. Thirteenth avenue is sixty feet wide from property line to property line. Four railroad tracks cross Thirteenth avenue in an easterly and westerly direction, Thirteenth avenue running north and south. The most northerly track is a "house track" just south of the warehouse and coal shed. Seventeen and twenty-seven one hundredths feet south of the "house track" is a stub track which ends just west of Thirteenth avenue, and does not cross the avenue. Thirty-four and six-tenths feet south of the stub track is the main track and there are two spur tracks south of the main track. There was a carload of cinders and some coal cars of the gondola type on the stub track. An eastbound combination train was on the main track, consisting of an engine, tender, combination mail and express car, and passenger car. The train was to stop at the depot about a block east of Thirteenth avenue. The brake was on and the train was

slowed down to about twelve miles per hour when it entered Thirteenth avenue. The fireman on the engine could see the truck from the time it passed the coal shed, and the truck driver could have seen the train from the time he passed the coal shed unless the view was obstructed by the cars on the stub track. After passing the stub track, the truck driver had a clear vision to the west, or the direction from which the train was coming, for a distance of at least six hundred feet.

The fireman saw the truck approaching at all times after it passed the coal shed, but the truck driver did not see the train until he was right on it when Keegan said "Hold her." He said he was looking straight ahead at a caboose and some freight cars on a spur south of the main track because there were some men there dressed as trainmen, and he thought they might signal that these cars were to be moved. The truck driver had crossed these tracks an average of three times a day for fifteen years, and said he could have stopped the truck within ten feet if he had seen the train. The fireman observed the truck coming along slowly between ten and fifteen miles an hour, and assumed it was going to stop at all times until it got ten or fifteen feet from the track, when it became evident it was not going to stop. He then called to the engineer to "plug her" which is an emergency exclamation for quick action. The engineer immediately set the emergency brake, which was everything that could be done, and the train stopped when the tender was just over the sidewalk on the east side of the street, the stop being made in a distance of sixty-five to seventy-five feet. The cowcatcher on the front of the engine struck the right front wheel of the truck, turning the truck to the east. Keegan died as a result of injuries received in the collision.

Appellant claims that the negligence of DeRemer, the truck driver, was the sole cause of the collision. The driver of the truck, which was a motor carrier under the statute, failed to come to a full stop at a distance of at least twenty feet and not more than forty feet from this grade crossing as provided in

sec. 85.92, Stats., and was therefore guilty of negligence. He had an absolute duty to look and listen for an approaching train before attempting to cross the railroad track and is also presumed to have seen what is in plain sight. *Bellrichard v. Chicago & N. W. R. Co.* (1945) 247 Wis. 569, 20 N. W. (2d) 710; *White v. Chicago & N. W. R. Co.* (1899) 102 Wis. 489, 78 N. W. 585; *Guhl v. Whitcomb* (1901), 109 Wis. 69, 85 N. W. 142; *Waitkus v. Chicago & N. W. R. Co.* (1931) 204 Wis. 566, 236 N. W. 531, 237 N. W. 259. He was negligent in failing to look and listen, and therefore not seeing the train he failed to stop.

The negligence of the truck driver does not relieve the Railroad Company if it was guilty of causal negligence. It was under no statutory or common-law duty to sound the whistle here, although it is required to blow the whistle and ring the engine bell at public-traveled grade highway crossings outside the limits of a municipality. Sec. 192.29, (4), Stats. In *Brager v. Milwaukee E. R. & L. Co.* (1936) 220 Wis. 65, 69, 264 N. W. 733, it was held that a motorman has a right to assume that an automobile traveling at a comparatively slow rate of speed toward a grade crossing will stop his car in a place of safety. Other decisions of like effect are *Dretzka v. Chicago & N. W. R. Co.* (1934) 216 Wis. 111, 113, 256 N. W. 703; *Peters v. Chicago, M., St. P. & P. R. Co.* (1939) 230 Wis. 299, 303, 283 N. W. 803; *Roswell v. Chicago, M., St. P. & P. R. Co.* (1942) 240 Wis. 507, 514, 2 N. W. (2d) 215; *De Wildt v. Thomson (Chicago & N. W. R. Co.)* (1942), 241 Wis. 352, 358, 6 N. W. (2d) 173.

Respondent relies on the case of *Webster v. Roth* (1945), 246 Wis. 535, 541, 18 N. W. (2d) 1, where it was said:

". . . if the man in charge of the engine saw the deceased approaching the crossing and about to go upon the track, and believed that he was unaware of the train's approach, it would be his duty to sound the whistle as well as to take every other reasonable precaution to prevent the collision."

Nothing there said deprives the engine crew of the right to assume that a traveler on a highway will look and listen and not go onto the track into danger when it is apparent that a train is approaching, and to continue this assumption until the contrary becomes apparent or he does something to indicate a contrary intention on his part. *Roswell v. Chicago, M., St. P. & P. R. Co., supra; De Wildt v. Thomson, supra; Peters v. Chicago, M., St. P. & P. R. Co., supra.* The truck in which deceased was riding was traveling at a slow rate of speed, which is evidenced by the fact that the driver said he could have stopped it within ten feet. There was nothing unusual in the manner in which the truck approached the train, nor is there any proof of facts which would cause a reasonable person to believe the driver of the truck was not aware of the approaching train.

Here we have a train moving at a slow rate of speed, the bell was ringing, and the fireman saw the truck approaching at a speed as slow as or slower than most cars and trucks approach a railroad crossing. A great number of cars approach railroad crossings in municipalities every day, and the mere fact that a car is approaching does not of itself require the whistle to be blown, because if it did, it would require the blowing of whistles at practically every crossing in every municipality. Blowing the whistle after it became apparent the truck was not going to stop would not have avoided the collision, as the truck was too close to the engine to be stopped at that time. As soon as it was evident the truck was not going to stop, every reasonable precaution was taken by the engine crew to prevent the collision. We conclude that the railroad was not negligent in its failure to blow the whistle under the facts in this case, and that the negligence of the driver of the truck was the sole cause of the collision.

*By the Court.*—Judgment reversed, and cause remanded with directions to dismiss plaintiffs' complaint.